**COPY**



Report to the General Assembly

LEGISLATIVE AUDIT COUNCIL

December 2005

# A Review and Follow-Up Report of the South Carolina Education Lottery





EXHIBIT

A

# LEGISLATIVE AUDIT COUNCIL

1331 Elmwood Ave., Suite 315
Columbia, SC 29201
(803) 253-7612 VOICE
(803) 253-7639 FAX

**Public Members**
Dill B. Blackwell, Chairman
Nancy D. Hawk, Esq., Vice Chairman
Marion H. Kinon, Esq.
Philip F. Laughridge, CPA
Henry M. Swink

**Members Who Serve Ex Officio**
Glenn F. McConnell
*Senate Judiciary Committee*
Hugh K. Leatherman
*Senate Finance Committee*
Rex F. Rice
*House Ways & Means Committee*
James H. Harrison
*House Judiciary Committee*

**Director**
George L. Schroeder

Authorized by §2-15-10 *et seq.* of the South Carolina Code of Laws, the Legislative Audit Council, created in 1975, reviews the operations of state agencies, investigates fiscal matters as required, and provides information to assist the General Assembly. Some audits are conducted at the request of groups of legislators who have questions about potential problems in state agencies or programs; other audits are performed as a result of statutory mandate.

The Legislative Audit Council is composed of five public members, one of whom must be a practicing certified or licensed public accountant and one of whom must be an attorney. In addition, four members of the General Assembly serve ex officio.

Audits by the Legislative Audit Council are conducted in accordance with generally accepted government auditing standards as set forth by the Comptroller General of the United States.

Copies of all LAC audits are available at no charge. We encourage you to visit our website to view and print copies of LAC reports.

**www.state.sc.us/sclac**

---

*A Review and Follow-Up Report of the South Carolina Education Lottery*
was conducted by the following audit team.

| | | |
|---|---|---|
| *Audit Manager* | *Senior Auditor* | *Auditor* |
| Priscilla T. Anderson | Andrew M. Young | Cynthia B. Piper |
| | | |
| Typography | | |
| Candice H. Pou | | Senior Legal Counsel |
| Maribeth Rollings Werts | | Andrea Derrick Truitt |

South Carolina Legislative Audit Council

# LAC

Report to the General Assembly

# A Review and Follow-Up Report of the South Carolina Education Lottery

LAC/SCEL-05

# Contents

**Synopsis** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

**Chapter 1**
**Introduction**

Audit Objectives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Scope and Methodology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**Chapter 2**
**Administrative**
**Expenditures**

Lottery Salaries Higher Than Those in Other State Lotteries . . . . . . . . . . . 5
Analysis Needed to Determine the In-House Cost of Purchasing . . . . . . . . 9
Internal Audit Noted Improprieties in Procurement Card Purchasing . . . . 11

**Chapter 3**
**Advertising and**
**Sale of Lottery**
**Tickets**

Inadequate Communication of the Odds of Winning . . . . . . . . . . . . . . . . 15
Lottery Tickets Sold After All Top Prizes Have Been Claimed . . . . . . . . 20
Prohibition Against Election Day Lottery Ticket Sales . . . . . . . . . . . . . . 22
No Data Collected on the Sale of Lottery Tickets to Minors . . . . . . . . . . 22
Illegal Gambling at Lottery Retail Outlets . . . . . . . . . . . . . . . . . . . . . . . . 24

**Chapter 4**
**Follow-Up**

Administrative Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
Lottery Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
State's Use of Proceeds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

**Appendices**

A   S.C. Education Lottery Scratch-Off Tickets . . . . . . . . . . . . . . . . . . . 35
B   Agency Comments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Contents

LAC/SCEL-05

# Synopsis

State law requires us to conduct a management audit of the South Carolina Education Lottery. We reviewed issues regarding administrative expenditures, the sale and advertisement of lottery tickets, and procurement. We also determined the status of recommendations that we made in our 2003 review of the lottery. Our findings are summarized as follows.

- State law requires that administrative expenditures are not to exceed 15% of the lottery's total revenue. In FY 04-05, the lottery's actual administrative expenditures were $109,399,614 which was 11.4% of its total revenue.

- The salaries of top executives at the lottery exceed those in other state lotteries. Although expenses for salaries comprise a small percentage of total lottery revenues, cost controls in this area could impact resources available for education.

- Lottery officials have not documented that it is more cost-effective to purchase advertising products (promotional items) through its advertising contractor. Lottery staff is already involved in these purchases and it appears that this process could easily be assumed by in-house procurement staff.

- In advertising its games and designing its lottery tickets, the lottery has not adequately communicated the odds of winning. Some advertisements contained no information on the odds of winning. In other advertisements, the lottery only indicated the overall odds of winning any prize, including a prize equal to the price of the lottery ticket. The lottery did not communicate the odds of winning a *top* prize in any of its advertisements or on any of its lottery tickets.

- The lottery has repeatedly sold scratch-off lottery tickets after all of the top prizes, printed on the front of the tickets, have been claimed. In FY 04-05, the lottery sold $19.9 million worth of lottery tickets for 16 games after all of the top prizes had been claimed. As a result, some customers may have purchased lottery tickets under the inaccurate impression that they had a chance of winning a top prize. The top prizes for these games ranged from $1,300 to $100,000.

- State law requires that a "lottery ticket must not be sold on the date of any general or primary election." This prohibition cost the lottery approximately $1.8 million in sales and $600,000 in net proceeds in calendar year 2004. A senior official with the South Carolina Election Commission stated that she did not believe the sale of lottery tickets on election days would negatively affect the election process.

- In its annual analysis of the types of people who buy lottery tickets, the lottery has excluded individuals under the age of 18, who may not legally buy tickets. The lottery is required by state law to hire an independent firm to determine the "age, sex, education, and frequency of participation of players." This law does not instruct the lottery to exclude minors from its analysis. In other states, surveys of minors and undercover studies have found that minors were often able to buy lottery tickets.

- Illegal gambling at some of the lottery's retail outlets has been uncovered by South Carolina law enforcement agencies. We identified 46 lottery retailers who engaged in illegal gambling on their premises in FY 04-05. This illegal competition, mostly in the form of video gambling, may be causing the lottery to lose sales. Businesses are also less likely to pay the required taxes on income from illegal gambling. The lottery's statutory authority to respond to illegal gambling, however, may be limited to cases in which a retailer has been criminally convicted. The Department of Revenue is authorized by state law to administratively suspend or revoke a retailer's beer and wine permit, or impose a fine, for illegal gambling, with or without a criminal conviction.

- The lottery has implemented six of the nine recommendations from our 2003 audit. In addition, recommendations regarding the use of lottery funds by other agencies have been implemented. The legislature did not approve appropriations for the teachers' grant program, one of the three programs in which a majority of lottery funds were not spent. No legislative action has been taken regarding laws which restrict lottery advertising.

Chapter 1

# Introduction

## Audit Objectives

Sections 59-150-30(B) and 2-15-63 of the South Carolina Code of Laws require the Legislative Audit Council to conduct a management audit of the South Carolina Education Lottery (SCEL). Based on the lottery's primary mission to provide funding for education, our review included an assessment of whether additional funds can be used for educational purposes. We also reviewed compliance with laws governing the sale and advertisement of lottery tickets as well as agency internal controls related to procurement. We developed these and other audit objectives after conducting preliminary audit work at the lottery. Our specific audit objectives are listed below.

- Review SCEL administrative expenditures to determine if funds have been used efficiently and additional funds can be returned to the education lottery account.

- Determine the lottery's compliance with state laws regarding the advertising and sale of lottery tickets.

- Determine whether the lottery has adequate internal controls regarding the procurement of goods and services.

- Determine the status of LAC recommendations made in the 2003 lottery audit.

## Scope and Methodology

This audit focused on the operations of the South Carolina Education Lottery. We reviewed aspects of management related to administrative expenditures, compliance with laws, and procurement of goods and services. In addition, we determined the status of recommendations from our last audit of the lottery. The period reviewed was generally from January 2004 to June 2005.

We conducted interviews with officials of the lottery in South Carolina and in other states. We reviewed SCEL documents to include:

- Lottery tickets.
- Personnel records.
- Policies and procedures.
- Commission minutes.

We also reviewed procurement records maintained by the lottery's advertising contractor.

LAC/SCEL-05

Chapter 1
Introduction

State laws in South Carolina and practices in other agencies in South Carolina as well as in lotteries in other states were used to evaluate operations of SCEL. We contacted other state lotteries as described in the audit report.

We used limited computer-generated data in conducting this review. When this information was viewed in context with other available evidence, we believe that opinions, conclusions, and recommendations in this report are valid. This audit was conducted in accordance with generally accepted government auditing standards.

## Background

The South Carolina Education Lottery was created in FY 01-02. Lottery ticket sales began in January 2002. As provided by state law, proceeds from sales must be used to support improvements and enhancements for educational purposes and programs.

SCEL is governed by a nine-member commission with three members each appointed by the Governor, the President Pro Tempore of the Senate, and the Speaker of the House of Representatives. The term of office for each commissioner is three years.

The lottery receives no appropriations from the General Assembly. Rather, funding for lottery operations is generated through the sale of lottery tickets.

As of June 30, 2005, the lottery had 149 employees and 3,534 retailers selling tickets. The SCEL headquarter office is in Columbia. In addition, there are three regional claim offices/redemption centers in Columbia, Greenville and Mount Pleasant.

We have conducted one previous audit of the lottery which was published in December 2003. In this review, we determined the status of the recommendations that we made in 2003 (see p. 29).

Tables 1.1 and 1.2 show the amount of lottery ticket sales and expenditures in FY 04-05. From FY 02-03 to FY 04-05, sales from games increased by 32% (from approximately $724 million to $957 million). Sales from instant games and Powerball accounted for approximately 80% of ticket sales in both this and our 2003 review.

Chapter 1
Introduction

**Table 1.1: FY 04-05 Lottery Games Sales**

| GAMES* | SALES | PERCENT |
|---|---|---|
| Instant Games | $578,838,812 | 61% |
| Powerball | 178,937,972 | 19% |
| Pick 3 | 118,853,836 | 12% |
| Pick 4 | 51,322,171 | 5% |
| Palmetto Cash 5 | 16,456,462 | 2% |
| Carolina 5 | 12,542,766 | 1% |
| TOTAL | $956,952,018 | 100% |

\*    Instant games are also called "scratch-off games." The ticket requires the player to remove a latex coating to determine if the ticket is a winner. Other games are online games where tickets are purchased through a network of computers.

Source: South Carolina Education Lottery

From FY 02-03 to FY 04-05, the SCEL's total expenditures increased by 32% (from approximately $728 million to $963 million). As in 2003, expenditures for prizes and the education lottery fund made up a large majority of lottery expenses.

**Table 1.2: FY 04-05 Lottery Expenditures**

| LOTTERY EXPENDITURES | AMOUNT | PERCENT |
|---|---|---|
| Prizes | $573,155,079 | 60% |
| Education Lottery Account | 280,145,176 | 29% |
| Retailer Commissions and Incentives | 67,534,047 | 7% |
| Operating Expenses | 41,865,567 | 4% |
| TOTAL | $962,699,868 | 100% |

Source: South Carolina Education Lottery

State law requires SCEL to deposit all net proceeds from lottery activities into an education lottery account. These funds are distributed through the Budget and Control Board's office of the state budget. The Education Lottery Act and annual appropriations acts determine how lottery funds are used.

**Chapter 1**
**Introduction**

LAC/SCEL-05

Chapter 2

# Administrative Expenditures

State law requires that the lottery's administrative expenditures are not to exceed 15% of its total revenue, including 7% for commissions to lottery retailers who sell lottery tickets and 8% for operating expenses such as employees' salaries and benefits, advertising and rent. In FY 04-05, the lottery's actual administrative expenditures were $109,399,614 which was 11.4% of its total revenue.

We found that the salaries of top executives at the lottery exceeded those in many other state lotteries. In addition, the lottery has not analyzed whether the purchase of promotional items by an advertising contractor on behalf of the lottery is more cost-effective than purchasing the items in-house.

## Lottery Salaries Higher Than Those in Other State Lotteries

We reviewed the salaries of top-level lottery officials whose job duties could be compared to those in other state lotteries. The salaries of South Carolina lottery executives were higher than many comparable officials in other states.

South Carolina Code §59-150-100 (A) authorizes the lottery to create its own job classification and compensation system. In addition, §59-150-80(A) provides that the compensation of the executive director must not be based upon or a function of profitability or percentage of sales. Individual lottery salaries have increased significantly since the lottery's inception in 2001. Employee salaries have increased due to position changes, reclassifications, equity adjustments and change in duties. Salaried employees have seen increases since date of hire averaging 25%.

## Comparison With Other State Lotteries

We compared the salaries of top lottery officials with similar positions in other states. Our selection of states was based on those with lottery sales equal to or greater than South Carolina in FY 03-04 (see Table 2.1) as well as those considered comparable to South Carolina by SCEL officials.

Chapter 2
Administrative Expenditures

Table 2.1: Lottery Salaries in
Other States, FY 04-05

| State | FY 03-04 Total Sales (in Millions) | Director | Highest Paid Deputy |
|---|---|---|---|
| New York | $5,848 | $144,287 | $115,616 |
| Massachusetts | $4,382 | $120,000 | $104,097 |
| Texas | $3,488 | $110,000 | $113,568 |
| Florida | $3,071 | $120,000 | $100,000 |
| California | $2,974 | $123,255 | Vacant |
| Georgia | $2,710 | *$225,000 | $195,000 |
| Pennsylvania | $2,352 | $110,429 | $106,041 |
| New Jersey | $2,187 | $102,900 | $96,366 |
| Ohio | $2,155 | $102,000 | $98,700 |
| Michigan | $1,974 | $113,000 | $106,229 |
| Rhode Island | $1,481 | $96,768 | $85,067 |
| Maryland | $1,395 | $132,341 | $96,309 |
| West Virginia | $1,303 | $75,000 | $80,208 |
| Virginia | $1,262 | $128,600 | $109,000 |
| **South Carolina** | **$950** | **$196,738** | **$166,350** |
| Kentucky | $725 | $196,700 | $156,453 |
| Tennessee | **$428 | *$350,000 | $180,000 |
| Louisiana | $340 | $130,923 | $100,935 |
| New Mexico | $149 | $177,000 | $105,000 |
| Median | $1,974 | $123,255 | $105,521 |

\*    Georgia's salary does not include a potential incentive of $100,000;
      Tennessee's salary does not include a potential incentive of $227,500.

\*\*    Lottery sales in Tennessee began 1/20/2004.

Source:    The North American Association of State and Provincial Lotteries
           and other state lotteries.

The lottery director in South Carolina was paid more than lottery directors in 16 of the 18 states for which we were able to obtain salary information. In addition, the salary of the highest-paid lottery deputy in South Carolina was more than the salary of the highest-paid deputy in 15 of the 17 states that responded to our request for information, and South Carolina's highest-paid deputy was paid more than the director in 14 states.

South Carolina lottery officials provided several reasons for their salary levels. We reviewed the basis of these justifications as follows.

LAC/SCEL-05

### Net Lottery Income Per Capita

Lottery officials stated that their ranking for the net income per capita (total revenues minus expenses divided by the state's population) justifies the compensation of upper management. South Carolina ranks 6th in net income per capita, $70, among the 18 lotteries in our salary comparison (see Table 2.2). We found that four states with higher net income per capita including Massachusetts, New York, New Jersey and Maryland, paid their lottery executive directors and deputy directors considerably less than South Carolina (see Table 2.1). Georgia was the only state with a higher ranking that paid higher salaries to executive management than South Carolina.

**Table 2.2: Net Lottery Income Per Capita By State, FY 03-04**

| STATE | NET LOTTERY INCOME PER CAPITA |
|---|---|
| Massachusetts | $142 |
| New York | $101 |
| New Jersey | $92 |
| Georgia | $88 |
| Maryland | $83 |
| SOUTH CAROLINA | $70 |
| Pennsylvania | $66 |
| Michigan | $62 |
| Rhode Island | $60 |
| Virginia | $55 |
| Florida | $53 |
| Ohio | $51 |
| Texas | $48 |
| Kentucky | $43 |
| Louisiana | $27 |
| California | $24 |
| West Virginia | $23 |
| New Mexico | $19 |
| Tennessee | n/a* |

\* The Tennessee lottery operated five months of the fiscal year.

Source: La Fleur's 2005 World Lottery Almanac.

### Lottery Operating Expenses

Lottery officials stated that South Carolina's expenses as a percent of total gross revenue are less than the median (6.9%) for other United States lotteries. Operating expenses in 14 of the other states that we reviewed were also less than median expenses in the United States. The salaries in 13 of these states were lower than salaries in South Carolina.

**Net Income Per Employee**

Lottery officials compare their net income per employee, approximately $2 million, to those of other states. South Carolina ranked 9th of the 18 states that we reviewed in this category. Only one state with a better ranking, Georgia, paid higher salaries than South Carolina. The other seven states (New York, New Jersey, Michigan, Pennsylvania, Texas, Maryland, and Massachusetts) with a better ranking paid lower salaries to the executive directors as well as the deputy directors.

## Lottery Salary Survey

A 2003 salary study which was commissioned by the SCEL confirmed our findings in this review. Salary data was received from 24 of 34 U.S. lotteries. Lotteries that responded to the study rated comparability of positions and provided salary ranges for positions. Each state did not respond to each position.

According to SCEL staff, the study was used to create compensation ranges for positions. According to a lottery official, only one person received a pay increase as a result of this study.

At the time of the study the salaries of SCEL's director and chief operating officer exceeded the maximum salary range for *all* survey respondents. In addition, 43% of the SCEL salaries exceeded the average midpoint for all respondents. Nevertheless, the director and many other employees have received substantial increases since the study.

The South Carolina Education Lottery has not established a methodology for compensating the director or other lottery officials based on actual salaries of other lottery officials. For example, the SCEL developed a salary range for the director in conjunction with the 2003 salary study; however, we found no correlation between the range established and the ranges of lottery director salaries reported.

Lottery officials have stated that compensation is set based on the private sector market rates; however, no evidence of private sector studies or comparisons have been provided.

Chapter 2
Administrative Expenditures

## More Funds for Education

The South Carolina Education Lottery Act requires that net proceeds from the lottery be deposited into the education lottery account and that appropriations for this account be used for educational purposes. When lottery funds are used for operating expenditures, there are fewer funds for education programs such as those for K-12, scholarships, and school buses.

## North Carolina Lottery

The North Carolina Lottery was signed into law in August 2005. During our audit exit process in November 2005, the lottery's first executive director was hired at an annual salary of $235,000 with a $50,000 incentive if the lottery is started within five months.

## Recommendation

1. The South Carolina Education Lottery should develop and implement a methodology for determining all employee salaries based on salaries in lotteries nationwide.

## Analysis Needed to Determine the In-House Cost of Purchasing

We reviewed advertising and marketing purchases made by a contractor on behalf of the lottery to determine if the contractor was obtaining bids from vendors as required by state law and as provided in the advertising contract. While we did not find a problem with the contractor seeking bids, it may be more cost-effective for the lottery to purchase its promotional items in-house rather than through the contractor.

State law requires the lottery to follow the state procurement code and authorizes the agency to advertise and promote the lottery and its games. The lottery contracts with Chernoff Newman (CN) for advertising and marketing services to include the purchase of goods and services. CN is paid a $15,000 monthly fee for advertising, marketing, and purchasing services and a 3% media commission for media placements (the placement of television, radio, print, and outdoor ads). In FY 04-05, monthly fees amounted to $180,000, and the media commission was approximately $190,000.

**Chapter 2**
**Administrative Expenditures**

In FY 04-05, CN purchases, on behalf of the lottery, totaled approximately $7.2 million (see Table 2.3). Eighty percent of the items purchased were for media placements. According to lottery officials in South Carolina, as well as in other states, these purchases require special expertise to obtain placements at the most economical price and at the most beneficial time. Media placements are exempt from the state procurement code.

**Table 2.3: FY 04-05 Advertising Purchases**

| ITEM | EXPENDITURES | PERCENT |
|------|-------------:|--------:|
| Media Placement of Advertising* | $5,759,964 | 80% |
| Special Events, Sponsorships*, Research | 808,621 | 11% |
| Point-of-Sale/Promotional | 339,460 | 5% |
| Production of Advertising | 299,004 | 4% |
| Miscellaneous | 10,338 | 0% |
| TOTAL | $7,217,387 | 100% |

\* The 3% media commission applies to media placements and some sponsorships involving media.

We reviewed procurement data for promotional items (merchandise such as T-shirts, cups, and hats used to promote lottery games) and point-of-sale items (merchandise at lottery retail outlets to include banners, stickers, and signs). Based on our review and according to a CN employee, the processing of these purchases generally includes the following steps:

- The lottery requests CN to purchase an item and provides specifications for the item.
- The lottery provides the names of vendors to CN to contact for bids.
- CN assigns a number for the purchase.
- CN contacts the vendors to request bids.
- CN receives bids from the vendors and sends them to the lottery.
- The lottery approves and initials the name of the vendor selected to provide the item.
- CN sends a purchase order from CN to the vendor since the purchase is from CN, not the lottery.
- CN enters the purchase in its computer system and bills the lottery.
- The lottery pays CN, and CN in turn pays the vendor for the item.

The lottery is involved in all phases of a purchase for promotional and point-of-sale items except those requiring direct contact with vendors. Based on the extent of involvement by lottery officials already, it appears that the processing of these purchases could easily be assumed by in-house procurement staff.

Lottery officials have not documented that it is cost-effective to purchase promotional and point-of-sale items through its advertising contractor. In 2003, the lottery hired marketing staff and assumed responsibility for media creation and production services formerly provided by CN. This resulted in a reduction in the monthly retainer to CN from $82,500 to $15,000.

Like South Carolina, lotteries in Texas and Louisiana have assumed some in-house responsibility for services previously performed by their designated contractors. According to officials in both of those states, promotional and point-of-sale items are purchased by the lottery, not the contractor.

According to SCEL management, the agency is considering an increase in in-house procurements. Officials stated that this objective is included in the agency's 2006 strategic plan.

## Recommendation

2.  The South Carolina Education Lottery should analyze the cost of purchasing promotional and point-of-sale items in-house as compared to the cost of purchasing these items through the advertising contractor. Based on the results of this analysis, if advantageous, adjustments to the advertising contract should be made.

## Internal Audit Noted Improprieties in Procurement Card Purchasing

In late 2004, prior to our review, the lottery's internal auditor began an audit of the lottery's use of state government procurement (credit) cards. The internal audit was initiated after the lottery's former procurement officer was found to have stolen American Express Gift Cheques, used to reward lottery retailers. In a draft report provided by the lottery in August 2005, the internal auditor noted several significant improprieties in the use of one of these cards. In addition, we found three areas where improvements could be made.

The lottery's internal auditor found that the lottery spent over $232,000 using its procurement cards between September 2001 and July 2004. The auditor noted the following improprieties:

- The lottery's former procurement officer purchased a Global Positioning Satellite unit for automobile navigation, received it personally, and was using it in his personal vehicle.

- The same lottery employee purchased over $1,300 in cellular phone equipment which could not be accounted for.

- The same lottery employee had inadequate receipt records for over $1,500 in purchases.

A follow-up review conducted by the internal auditor in 2005 concluded that the current procurement officer was in compliance with procurement procedures.

In a limited review by the LAC, we found the following:

- Lottery officials stated they used the procurement card policies and procedures suggested by the Budget and Control Board but had not incorporated them into the lottery's purchasing manual. Lottery officials stated that they planned to do so.

- It is not clear whether the lottery has conducted training for its cardholders, as required by the lottery's policies and procedures. Lottery officials stated that its cardholders "were given a copy of the purchasing card procedures and were briefed at the time their cards were issued." They did not provide us with documentation that cardholders underwent briefing/training.

- Prior to our review, three of the lottery's four cardholders had not signed "cardholder agreements," as required by the lottery's policies and procedures. In these agreements, employees note that they understand the policies and procedures regarding the cards and the consequences of improper use. These agreements were signed in August 2005, after our inquiry.

# Recommendations

3. The South Carolina Education Lottery should formally incorporate the Budget and Control Board's policies and procedures for procurement cards, with any needed amendments, into its purchasing manual.

4. The South Carolina Education Lottery should implement formal training of employees with agency procurement cards regarding their usage and the relevant policies and procedures.

5. The South Carolina Education Lottery should ensure that employees with agency procurement cards sign "cardholder agreements."

Chapter 2
Administrative Expenditures

LAC/SCEL-05

Chapter 3

# Advertising and Sale of Lottery Tickets

We found the following regarding the advertising and sale of lottery tickets:

- The lottery has not adequately communicated the odds of winning.
- Lottery tickets have been sold after all top prizes have been claimed.
- State law does not allow the sale of lottery tickets on election day.
- No data has been collected on the sale of lottery tickets to minors.
- Illegal gambling has been occurring at lottery retail outlets.

## Inadequate Communication of the Odds of Winning

We reviewed the extent to which the S.C. Education Lottery has communicated the odds of winning to its customers. In some of its advertisements, the lottery did not communicate the odds of winning. In other advertisements, the lottery communicated the overall odds of winning any prize, including a prize equal to the price of the lottery ticket. The lottery did not communicate the odds of winning a top prize in any of its advertisements or on any of its lottery tickets. In addition, because the lottery has communicated the odds of winning only in writing, it may not be reaching customers with low reading skills.

## South Carolina Law

Section 59-150-60 (A)(18) of the South Carolina Code of Laws, which addresses advertising by the lottery, states:

> ...The [lottery] commission must promote fair and responsible play, including disclosure of the odds of winning, and must ensure that any advertising used does not exhort the public to bet by misrepresenting, directly or indirectly, a person's chance of winning a prize....Wherever lottery game tickets are sold, a lottery retailer must post a conspicuous sign in a prominent location, inside the retailer's premises and adjacent to the point of sale, clearly warning of the dangers and risks of gambling and the odds of winning and the odds of losing.

## Media Ads

### Television

We reviewed all four television advertisements shown in April 2005. Three ads were for a game called *Palmetto Cash 5,* whose top prize was $500,000.

- In the first *Palmetto Cash 5* ad, the announcer did not mention prize amounts. However, on a retail display for the game, visible in the background, the amount "$500,000" was shown. Also, a prize check for $500,000 was shown. The announcer stated that "hundreds of thousands of people are playing and winning." At the bottom of the screen was a statement in small print that read, "Overall odds of winning are 1 in 8.4."

- In the second *Palmetto Cash 5* ad, the announcer stated that there was "a chance to multiply your winnings up to half a million dollars." At the bottom of the screen was a statement in small print that read, "Overall odds of winning are 1 in 8.4."

- In the third *Palmetto Cash 5* ad, the announcer did not mention prize amounts. In large print, near the middle of the screen, the top prize of "$500,000" was displayed. The announcer stated that "hundreds of thousands of people are playing and winning." The ad did not communicate the odds of winning.

In the first and second *Palmetto Cash 5* ads, "1 in 8.4" indicated the overall odds of winning *any* prize, including a breakeven prize of $1. Not included in the ads were the odds of winning the $500,000 top prize, which the lottery reported were 1 in 8 million.

The fourth television ad we reviewed was for a multi-state game called *Powerball.* The announcer stated that 14 South Carolina players "broke the *Powerball* bank" on March 30, with six players winning $100,000 and eight players winning $500,000. This ad did not communicate the odds of winning, which were 1 in 2.9 million for $100,000 and 1 in 7.3 million for $500,000.

### Radio

We reviewed all four radio ads broadcast in April 2005. One ad communicated the education programs supported by lottery funds, while the others were commercials for specific lottery games. One ad was for a game called *Rapid Refund 2,* in which the announcer noted that the top prizes available were $500. One ad was for a game called *NASCAR,* in which the announcer noted that the top prizes available were $50,000. A final ad was for *Palmetto Cash 5,* in which the announcer noted that the top prizes available were $500,000. None of these ads communicated the odds of

winning a prize. The lottery reported that the odds of winning a top prize in these games ranged from 1 in 6,300 to 1 in 8 million.

### Print

We reviewed the lottery's only print ad from April 2005, which appeared in several newspapers around the state. The ad, for *Palmetto Cash 5*, stated that the "top prize ranges from $200,000 to $500,000." It prominently featured one player who won $200,000 and another who won $500,000. The ad did not communicate the odds of winning a prize, which the lottery reported were 1 in 1 million for $200,000 and 1 in 8 million for $500,000.

### Billboards

We reviewed the lottery's only billboard ad from April 2005, which appeared on billboards around the state. The ad communicated that *Powerball* tickets were sold in South Carolina and indicated the current top prize available. The billboards did not communicate the odds of winning *Powerball's* top prize, which were 1 in 121 million.

## Retail Displays

In May 2005, the LAC visited five lottery retail outlets in Columbia and five in Fort Mill. Nine of the retailers had signs, produced by the lottery, indicating the odds of winning as well as the dangers and risks of gambling. The signs were 4 x 11 inches, written in small print, and sometimes posted more than 10 feet from the cash register.

The lottery did not have a written definition to help retailers comply with the law that mandates a "conspicuous sign in a prominent location, … adjacent to the point of sale." The contract between the lottery and its retailers requires these signs to be "at or near each cash register where tickets are sold." This contractual phrase, however, is not more specific than the statutory phrase, "adjacent to the point of sale."

For three of the lottery's five online games, the 4 x 11-inch signs indicated the odds of winning the smallest prize and the odds of winning a top prize. For the fourth online game, *Palmetto Cash 5*, the signs did not indicate the odds of winning a $500,000 top prize. For the fifth online game, *Add a Play*, and for all of the lottery's scratch-off games, the signs did not indicate the odds of winning a top prize. Rather, they indicated a range of the overall odds of winning any prize.

## Lottery Tickets

We reviewed the lottery's five online games and 42 scratch-off games in effect in April 2005.

None of the tickets for the lottery's five online games included the odds of winning. Four of the online games had number selection forms. On the back of the number selection forms for three of these games was small print indicating the odds of winning various prize amounts, including a top prize. For *Palmetto Cash 5*, the number selection form did not indicate the odds of winning a $500,000 top prize.

Each ticket for the lottery's scratch-off games indicated the *top* prize on the front of the ticket and the overall odds of winning *any* prize on the back of the ticket. The odds of winning a top prize were not printed on the tickets. For example:

- For a scratch-off game called *Cash Bonanza*, the front of the ticket indicated that the top prize was $250,000. The back of the ticket stated "OVERALL ODDS: 1:2.64." Not included on the ticket were the odds of winning a $250,000 top prize, which the lottery reported were 1 in 720,000.

- For a scratch-off game called *Giant Jumbo Bucks*, the front of the ticket indicated that the top prize was $75,000. The back of the ticket stated "OVERALL ODDS: 1:3.14." Not included on the ticket were the odds of winning a $75,000 top prize, which the lottery reported were 1 in 2 million.

## Lottery Website

On its website, for each game, the lottery communicated the odds of winning various prize amounts. However, one-third of adults in the United States do not use the Internet, according to a February – March 2005 survey by the Pew Internet and American Life Project.

## Reaching Customers With Limited Reading Skills

Because a significant number of South Carolina adults have low reading skills, verbal statements in the lottery's television and radio ads would allow for more effective communication of the odds of winning. According to an estimate based on the *1992 National Adult Literacy Survey*, 25% of South Carolina adults were in the lowest of five categories of reading ability, while 56% were in the lowest two categories combined.

LAC/SCEL-05

The lottery has not consulted with reading/literacy experts to increase the likelihood that its written communications can be understood by customers with moderate reading skills. To make documents readable, literacy experts suggest the careful use of language. They also recommend avoiding small print, words with all capital letters, and italics.

We identified literacy experts who recommended a 10- to 14-point type size for persons with moderate reading skills. More than 80% of the lottery's scratch-off tickets in April 2005 stated the odds of winning in letters of less than 10-point type size. Also, some words were in all capital letters. [See Appendix A (pp. 35-37) for examples of two South Carolina lottery tickets.]

## Summary

In advertising its games and printing lottery tickets, the South Carolina Education Lottery has not consistently communicated the odds of winning. When it has communicated the odds of winning, the lottery often has told its customers the overall odds of winning any prize, including a prize equal to the price of the lottery ticket, but not odds of winning a top prize.

Because the lottery has not verbally communicated the odds of winning in its television and radio ads, it is unlikely that the lottery is reaching customers with low reading skills.

## Recommendations

6.  When the South Carolina Education Lottery advertises a top prize for any of its games, it should include the odds of winning a top prize.

7.  When the South Carolina Education Lottery advertises a top prize for any of its games on television or radio, it should verbally communicate in the ad the odds of winning a top prize.

8.  When the South Carolina Education Lottery prints a top prize on a lottery ticket or number selection form, it should also print on the ticket or form the odds of winning the top prize.

9.  The South Carolina Education Lottery should obtain and follow advice from reading/literacy experts to ensure that written communications to lottery customers can be read by persons with moderate reading skills.

10. To ensure compliance with §59-150-60 (A)(18) of the South Carolina Code of Laws, the South Carolina Education Lottery should define in writing what constitutes the posting of "a conspicuous sign in a prominent location, inside the retailer's premises and adjacent to the point of sale, clearly warning of the dangers and risks of gambling and the odds of winning and the odds of losing."

# Lottery Tickets Sold After All Top Prizes Have Been Claimed

The South Carolina Education Lottery has continued to sell tickets for scratch-off games after all of the top prizes, printed on the front of the tickets, have been claimed. As a result, some customers may have purchased lottery tickets under the inaccurate impression that they had a chance of winning a top prize.

In FY 04-05, the lottery sold $19.9 million worth of tickets for 16 scratch-off games after all top prizes had been claimed. This total represented 12% of sales for these games. There was a median of nine weeks between the claiming of the final top prize and the last date tickets were permitted to be sold. The top prizes for these games ranged from $1,300 to $100,000.

The lottery has not adequately communicated the availability of top prizes for its scratch-off games:

- On its website, the lottery reported how many top prizes remained available for each scratch-off game. This information was updated approximately weekly.

- On kiosks in its retail outlets, the lottery posted 5½ x 8½-inch cards indicating the availability of top prizes for games scheduled to end soon. These cards were updated approximately monthly.

- On the back of some scratch-off cards, in small print, was the statement, "Number of prizes and total value may vary depending on the actual number of tickets delivered to SCEL and <u>may vary as tickets are sold.</u>" [Emphasis added.]

- On the back of other scratch-off cards, in small print, was the statement, "Availability of All Prizes (INCLUDING TOP PRIZES) are [sic] <u>subject to prior sales.</u>" [Emphasis added.]

The above information displayed on the lottery's website and at its retail outlets was not current. As noted on page 18, a third of adults in the United States do not use the Internet. Also, disclaimers on the backs of lottery tickets do not let customers know whether the prize featured on the front is available.

Lottery officials report that there is legal authority for selling scratch-off tickets after the top prizes printed on the tickets are no longer available. In 2002, the General Assembly approved Regulation 44-40.10 (C)(2), which stated, "A lottery retailer may continue to sell tickets for each instant [scratch-off] game up to ninety (90) days after the official end of that game."

The above regulation was written by the lottery and submitted to the General Assembly for its approval.

The most effective method for ensuring that customers are not misled would be for the lottery to discontinue selling tickets when it knows that the top prizes printed on the tickets are no longer available. If the sale of such tickets were discontinued, customers would still have other games from which to choose. For example, we counted 40 scratch-off games offered for sale in July 2005, including 36 offered the entire month.

According to the policy of Virginia's lottery, when the final top prize has been claimed for a scratch-off game, "the Virginia Lottery will notify all Lottery retailers and regional offices [via electronic message] to cease selling the affected game and to return unsold tickets ...." After this notification, lottery representatives collect the unsold tickets.

In California, when one prize remains for a scratch-off game, the lottery begins an "accelerated game close procedure" to collect the unsold tickets from retailers. If the final top prize is claimed during this collection period the lottery instructs the retailers, via electronic message, "to stop selling tickets for that game."

# Recommendations

11. The South Carolina Education Lottery should discontinue the practice of selling lottery tickets when it knows that the top prizes printed on the tickets are no longer available.

12. The South Carolina Education Lottery should submit a request to the General Assembly to amend Regulation 44-40.10 (C)(2), so that lottery retailers are required to discontinue the sale of scratch-off lottery tickets immediately after being notified that a game has been officially ended.

13. The General Assembly should approve a request from the South Carolina Education Lottery to amend Regulation 44-40.10(C)(2), so that lottery retailers are required to discontinue the sale of scratch-off lottery tickets immediately after being notified that a game has been officially ended.

Chapter 3
Advertising and Sale of Lottery Tickets

## Prohibition Against Election Day Lottery Ticket Sales

Section 59-150-210 (E) of the South Carolina Code of Laws states that a "lottery ticket must not be sold on the date of any general or primary election."

The effect of this prohibition in calendar year 2004 (which included a general election and a primary election) was a loss of approximately $1.8 million in sales and $600,000 in net proceeds available for education. In making these estimates, we took into account that, under the current law, sales increase in the days before and after elections.

According to officials with the lottery, this prohibition is implemented in even-numbered calendar years, when general and primary elections occur for statewide and/or national offices.

A senior official with the South Carolina Election Commission stated that she did not believe the sale of lottery tickets on election days would negatively affect the election process.

## Recommendation

14. The General Assembly should amend §59-150-210 (E) of the South Carolina Code of Laws to repeal the prohibition against lottery ticket sales on primary and general election days.

## No Data Collected on the Sale of Lottery Tickets to Minors

State law requires that the lottery hire an independent firm to conduct a demographic analysis of the lottery's customers once a year through 2006. In the demographic studies conducted thus far, the lottery has not determined the extent of lottery ticket sales to customers under the age of 18.

Section 59-150-210 (D) of the South Carolina Code of Laws prohibits the sale of lottery game tickets to persons under 18. A person 18 or older, however, may legally give a lottery ticket to a person of any age.

Chapter 3
Advertising and Sale of Lottery Tickets

Section 59-150-325 (C) requires an annual demographic analysis, but it does not instruct the lottery to exclude customers under the age of 18 from the analysis. It states that the lottery:

> ... must provide to the [education lottery] oversight committee a complete report of a demographic analysis of lottery players. The [lottery] commission must employ an independent firm experienced in demographic analysis to conduct the demographic study of lottery players.... The report must include the income, age, sex, education, and frequency of participation of players.

In 2002, 2003, and 2004, the lottery contracted with independent firms to conduct telephone surveys to determine the demographic characteristics of those who purchase lottery tickets. In each of these surveys, however, questions were only asked of individuals who were 18 and older. As of August 2005, a contractor had been selected for the 2005 survey, which will also limit questions to persons 18 and older. The information reported in these surveys may not provide a complete description of the lottery's customers.

In other states, surveys of minors and undercover studies have found that minors were often able to buy lottery tickets. A 1990 written survey in Massachusetts (where the minimum age to buy a lottery ticket is 18) found that 23% of seventh grade students reported buying a lottery ticket in the past 30 days. A 1999 undercover study in New York City (where the minimum age to buy a ticket is 18), found that persons aged 10 through 16 were able to buy scratch-off lottery tickets 30% of the time. A 1999 undercover study in Louisiana (where the minimum age to buy a ticket is 21), found that persons aged 18 through 20 were able to buy lottery tickets 64% of the time.

## Recommendation

15. The South Carolina Education Lottery should ensure that persons under the age of 18 are included in demographic studies initiated by the lottery that analyze the age of its customers.

# Illegal Gambling at Lottery Retail Outlets

Illegal gambling at some of the lottery's retail outlets has been uncovered by South Carolina law enforcement agencies. We identified 46 lottery retailers who engaged in illegal gambling on their premises in FY 04-05. This illegal competition, mostly in the form of video gambling, may be causing the lottery to lose sales.

Lottery officials stated that they "likely" do not have the legal authority to deny, suspend, or revoke a retailer's lottery contract for illegal gambling unless the retailer has been criminally convicted of illegal gambling. However, criminal prosecution of lottery retailers found to have engaged in illegal gambling is not common. In addition, state law does not permit the lottery to impose fines for illegal gambling. The Department of Revenue is authorized by state law to administratively suspend or revoke a retailer's beer and wine permit, or impose a fine, for illegal gambling, with or without a criminal conviction.

## The Lottery's Authority to Respond to Illegal Gambling May Be Limited

The lottery contracts with more than 3,500 businesses to sell lottery tickets. The authority of the lottery to respond to illegal gambling by these businesses may be limited by state law to cases in which a retailer has been criminally convicted.

Section 59-150-150 (B) (2) of the South Carolina Code of Laws states that a person or business entity:

> ... must not be selected as a lottery retailer if he or it ... has been convicted of unlawful gambling activity ... unless the person's civil rights have been restored and at least five years have elapsed from the date of the completion of the sentence without a subsequent conviction ...

Before the lottery can refuse an applicant's request for a retail contract due to illegal gambling activity, the retailer must have been criminally convicted of illegal gambling.

Section 59-150-180 (A) states:

> A retail contract executed by the [lottery] commission pursuant to this chapter must specify the reasons for which the contract may be canceled, suspended, revoked, or terminated by the commission including, but not limited to:

> > (1) a violation of [the Education Lottery Act], a regulation, or a policy or procedure of the commission.

Section 59-150-180 (B) states:

> If cancellation, denial, revocation, suspension, or rejection of renewal of a
> lottery retailer contract is in the best interest of the lottery, the public
> welfare, or the State of South Carolina, the executive director or his
> designee, in his discretion, may cancel, suspend, revoke, or terminate, after
> notice and a right to a hearing, a contract issued pursuant to this chapter.

The lottery has not specifically prohibited illegal gambling in its retail
contract. If the lottery were to specify illegal gambling in its retail contract
as a reason to suspend, revoke, or terminate a contract, the lottery could
initiate such actions by claiming a contract violation, with or without a
criminal conviction. However, lottery officials state that it "is likely to be
beyond SCEL's statutory authority" to penalize a retailer for illegal
gambling, in the absence of a criminal conviction, even if specified in the
contract.

State law also does not give the lottery authority to issue administrative fines
against its retailers for illegal gambling.

## Recent Responses By the Lottery to Illegal Gambling

The lottery has taken some steps to respond to illegal gambling at its retail
outlets. Because criminal prosecution of lottery retailers found to have
engaged in illegal gambling is not common, the lottery's efforts have been
limited.

In 2003, the lottery filed a brief with the state Supreme Court in support of a
lower court's ruling that the selling of a certain product sold by some
businesses in 2000, prior to the existence of the lottery, was a form of illegal
gambling. The product in question was a $1 prepaid long-distance phone
card combined with a chance to win a cash prize. This legal dispute began
when the South Carolina Law Enforcement Division (SLED) confiscated
some of the machines from which these cards were dispensed. The state
Supreme Court upheld the ruling of the lower court. The lottery informed its
retailers of the Supreme Court's decision.

In 2004, the lottery temporarily denied renewal of a retailer's license,
because one of the partners in the business had recently been convicted of
operating illegal video gambling machines on the premises of the business.
After the convicted partner surrendered his ownership in the business, the
license was renewed, with no lapse in the retailer's authority to sell lottery
tickets.

Approximately twice a month, the lottery's sales representatives visit each lottery retail outlet. There is no written lottery policy requiring notification of law enforcement agencies when potential illegal gambling is observed at a lottery retail outlet. Law enforcement agencies are experienced in determining whether a suspected activity or device constitutes illegal gambling. Lottery officials state that, during our audit, they notified law enforcement agents about potential illegal gambling at two lottery retail outlets.

## Enforcement of Illegal Gambling Laws by SLED and the Department of Revenue

Investigations into illegal gambling are regularly conducted by SLED and local law enforcement agencies. Using evidence obtained by these agencies, the Alcoholic Beverage Licensing Section of the Department of Revenue has the legal authority to suspend and/or revoke beer and wine permits held by retailers. The Department of Revenue also has the authority to impose fines, which it has done frequently.

S.C. Code §61-4-580 states that no holder of a license authorizing the sale of beer or wine may knowingly permit illegal gambling on the premises covered by the permit. This section authorizes the Department of Revenue to revoke or suspend a beer and wine permit by administrative action, without a criminal conviction. Section 61-4-250 authorizes the Department of Revenue to impose administrative fines of $25 to $1,000 on retailers of beer and wine found to have allowed illegal gambling on their premises. Section 12-21-2710 prohibits the possession or operation of video gambling machines. A person convicted of violating this section may be fined up to $500 and imprisoned for up to a year. Section 16-19-40 prohibits a retail store that sells "spirituous liquors" from being used as a place for various forms of gambling. A person convicted of "keeping" such a store may be fined up to $2,000 and imprisoned for up to a year.

We identified 46 retailers licensed to sell beer and wine as well as lottery tickets, who paid fines to the Department of Revenue in FY 04-05 for engaging in illegal gambling on their premises, in violation of §61-4-580. In one of these cases, an employee of a retailer was criminally convicted and paid a fine for keeping a store used for illegal gambling, in violation of §16-19-40. Revenue officials reported no suspensions or revocations of the 46 retailers' beer and wine permits.

## Conclusion

Illegal gambling may be causing the lottery to lose sales, particularly when it is available within lottery retail locations. Businesses are also less likely to pay the required taxes on income from illegal gambling. Better enforcement of illegal gambling laws could yield additional revenue to the state.

# Recommendations

16. The South Carolina Education Lottery should enact a written policy that requires its staff, during visits to lottery retail outlets, to observe the premises for evidence of potential illegal gambling.

17. When the South Carolina Education Lottery observes evidence of potential illegal gambling, it should inform law enforcement officials, in writing.

18. The General Assembly should amend state law to authorize the South Carolina Education Lottery to deny, suspend, revoke, or terminate the contracts of lottery retailers or applicants who have been found to have allowed illegal gambling on their premises, regardless of whether it is an administrative violation or a criminal conviction.

19. The General Assembly should amend state law to authorize the South Carolina Education Lottery to impose administrative fines against lottery retailers who have been found to have allowed illegal gambling on their premises, regardless of whether it is an administrative violation or a criminal conviction.

Chapter 3
Advertising and Sale of Lottery Tickets

LAC/SCEL-05

# Follow-Up

In our 2003 audit of the lottery, we reviewed general management controls and issues relating to lottery retailers and their compensation. We also reviewed controls to ensure that lottery proceeds for education were spent in accordance with state law. We made recommendations to the lottery, to the General Assembly, and to the agencies receiving lottery funds.

In this audit, we determined the status of our 2003 recommendations. We concluded that the lottery has implemented six of the nine recommendations that we made in 2003. Recommendations regarding the use of lottery funds by other agencies have been implemented. While no legislative action has been taken regarding laws which restrict advertising, in FY 05-06, the legislature did not approve funds for one of the three education programs in which funds had not been spent.

## Administrative Management

Our 2003 findings and the current status of our recommendations regarding administrative functions of the lottery are detailed below.

### Cell Phones

In 2003, we examined the lottery's use of cell phones. We recommended that the number of cell phones provided to employees be reduced and that the lottery monitor the use and costs of cell phones. We estimated that the lottery could reduce the number of cell phones by at least 30, which would yield an annual savings of more than $24,000.

The lottery has monitored its cell phones and obtained a less expensive plan with a reduced amount of minutes. Officials have also developed detailed policies for cell phone use.

There has been a slight reduction of cell phones from 86 in 2003 to 84 in 2005. Further, there are still employees who primarily have administrative desk jobs in the agency's headquarter office that continue to have phones. According to lottery officials, these employees need cell phones because they are on call 24 hours a day for gaming operation, integrity, security and disaster recovery. The validity of some of these justifications is questionable since other state agencies have ways to contact staff in case of emergencies without providing them with cell phones.

Chapter 4
Follow-Up

## Leased Cars

In 2003, we found that the lottery reimbursed marketing and sales representatives (MSRs) for use of their personal vehicles and provided leased vehicles for employees located primarily in the main office whose usage of the cars was low. We recommended that SCEL consider providing state-owned leased cars to employees when it was more cost-effective to do so. Also, we recommended that the agency should not provide state vehicles to its employees when it would be less expensive to reimburse them for use of their own vehicles.

The lottery has considered providing leased vehicles to employees on state business and determined that it was more cost-effective to provide leased vehicles to *some* MSRs. However, the agency has not provided leased cars to these employees. Lottery officials have determined that providing cars to some MSRs while allowing others to drive their own vehicles may result in morale problems. Officials also told us that the agency did not want to enter into a year lease based on unknown factors such as changing MSR routes and rising gas prices. Further, officials stated that an additional staff person would be needed to administer and monitor leased vehicles.

The SCEL has monitored its leased fleet and in four cases exchanged cars to receive a lower rate. Lottery officials stated that they will continue to review this area. An internal audit of the state-owned fleet is scheduled in 2005.

## Contracts

In 2003, we found that the South Carolina Law Enforcement Division (SLED) provided investigative services to the lottery without a written contract. We recommended that a contract be developed.

In January 2005, the lottery entered into a formal contract with SLED to provide services for a one-year time frame. According to lottery officials, costs and performance are monitored by the agency's security department.

## Performance Measures

In 2003, the lottery did not have a formal system of measuring results throughout the organization and measured performance only by whether its revenue goal was met.

Agency officials have developed additional performance measures, such as the number of violations received and complaints resolved, and included them in the lottery's annual report as we recommended. However, lottery officials have not maintained data about the status of these measures. The

information maintained by the lottery does not show the status of performance measures but rather the progress of agency projects not related to measures.

### Statutory Changes

In 2003, we reviewed state laws regarding the lottery to identify any amendments that could be beneficial to the state. We concluded that some advertising restrictions could be changed to reduce costs and to increase lottery sales. We recommended that the General Assembly consider amending state law to allow the lottery to have more flexibility in its marketing efforts, allow the lottery to give tickets away for promotional purposes, and eliminate the requirement that the lottery use the telecommunications network services of the Budget and Control Board's Office of Information Resources. The General Assembly has taken no action regarding these recommendations.

## Lottery Operations

The findings and status of our recommendations involving lottery retailers and prize payments follow.

### Licensing Procedures

We reviewed the lottery's retailer licensing procedures and found that the policies and procedures were incomplete and needed to be updated. As of December 2004, the lottery updated the retailer licensing procedures.

### Retailer Debts

Section 59-150-170(A) of the S.C. Code of Laws requires that the lottery establish a fidelity fund for which each retailer is assessed a one-time fee that may be used to cover losses from lottery retailers. In 2003, the lottery had not established a policy to use the fidelity fund for debts considered uncollectible. As recommended, the SCEL has developed a formal policy on the use of the fidelity fund. As of August 2005, the fidelity fund had not been used to pay retailer debts.

### Prize Payments

In 2003, we found that the SCEL had a good system of controls over prize payments; however, an independent review of policy compliance would strengthen these controls. We recommended that the lottery conduct internal audits to review compliance with policies for prize payments. Audits of claim

Chapter 4
Follow-Up

center operations were scheduled in FY 04-05, but reviews had not been conducted as of June 30, 2005.

The South Carolina Education Lottery Act requires that the SCEL withhold debts submitted by other agencies from winnings of $5,000 or more. In 2003, we recommended that the General Assembly lower the threshold for debt examination in South Carolina Code §59-150-330(F) from $5,000 to $2,500. The General Assembly has taken no legislative action regarding this recommendation.

## State's Use of Lottery Proceeds

In 2003, we reviewed the adequacy of controls to ensure that lottery funds were used as intended in six agencies:

- The Commission on Higher Education.
- The Department of Education.
- The South Carolina Educational Television.
- The Higher Education Tuition Grants Commission.
- South Carolina State University.
- The State Library.

We found that the State Auditor's office, which was charged with ensuring that agencies receiving lottery funds had procedures in place to monitor expenditures, had not developed steps to review those procedures. Also, we found that controls among agencies were uneven and still being developed.

In addition in 2003, agencies that were appropriated lottery funds had not expended those funds. The Budget and Control Board had not used the first $1 million in unclaimed lottery prize monies to contract for services to assist in the prevention and treatment of gambling disorders. The Commission on Higher Education had not used over 80% of the funds appropriated for teacher grants (funds for public school teachers to upgrade skills or obtain a master's degree) or the National Guard Tuition repayment program (a program which provides incentive to the South Carolina Army and Air National Guards). The commission had not used any of the funds appropriated for the endowed chairs program (grants awarded to the state's three research institutions through a competitive application process).

Chapter 4
Follow-Up

We made three recommendations. Agencies and the General Assembly have taken the following steps:

*We recommended that all agencies administering lottery funds should establish appropriate controls to ensure that lottery funds are used as intended.*

The State Auditor's office has developed steps to ensure that agencies are using lottery funds appropriately and that agency policies are effective.

In addition, controls within agencies to ensure the proper use of lottery funds have improved. For example, in 2003, SDE had not reviewed the use of lottery funds by school districts. The agency's compliance section now conducts random compliance audits for lottery funds, and local firms who audit school districts include a review of lottery funds and sample expenditures.

*We recommended that all agencies allocated lottery funds should ensure that administrative costs incurred are minimal.*

Officials in five of the six agencies that we contacted during this audit stated that minimal lottery funds are devoted to administrative expenses. (South Carolina State University did not provide an estimate of costs.) Estimates at the agencies ranged from no administrative costs to 1.5%.

*We recommended that the General Assembly should consider whether previously appropriated lottery funds have been spent when deciding on future appropriations of lottery funds.*

In January 2004, the Budget and Control Board entered into one contract for treatment of gambling disorders and another for operation of a hotline with the Department of Alcohol and Other Drug Abuse Services. The unspent funds for contracted services in 2004 were rolled over to provide services in 2005.

The Commission on Higher Education still has not spent a majority of the funds appropriated for the same three programs with unspent funds in 2003 (see Table 4.1). In FY 04-05 the funds expended for the three programs ranged from 3% to 18% of the available lottery funds.

LAC/SCEL-05

Chapter 4
Follow-Up

Table 4.1: Unspent Lottery Funds

| CHE PROGRAM | FY 04-05 APPROPRIATIONS INCLUDING CARRY FORWARD FUNDS | FY04-05 EXPENDITURES | FUNDS REMAINING |
|---|---|---|---|
| National Guard | $4,246,505 | $149,718 (3%) | $4,096,787 (97%) |
| Teacher Grants | $5,319,906 | $839,608 (15%) | $4,480,298 (85%) |
| Endowed Chairs | $82,282,257 | $15,261,460 (18%) | $67,020,797 (82%) |

The General Assembly considered but did not enact changes in CHE appropriations in FY 03-04 and FY 04-05. In FY 05-06, the General Assembly did not approve any funds for the teacher grant program (previously funded at $2 million a year) while the level of funding for the endowed chairs program remained at $30 million a year. In addition, despite the low usage of previously appropriated lottery funds, appropriations for the National Guard program were increased from $1.5 million to $1.7 million. Lottery funds should be shifted to areas where more support is needed and to maximize funds.

## Recommendations

20. The South Carolina Education Lottery should continue to reduce the number of cell phones provided to employees.

21. The South Carolina Education Lottery should maintain data on the status of its performance measures.

22. The South Carolina Education Lottery should periodically conduct internal audits to review compliance with policies for prize payments.

23. The General Assembly should continue to consider whether previously appropriated lottery funds have been spent when deciding on future appropriations of lottery funds.

# S.C. Education Lottery Scratch-Off Tickets

## NASCAR



(Front)

Appendix A
S.C. Education Lottery Scratch-Off Tickets

# NASCAR



(Back)

LACNSCEL-05

Appendix A
S.C. Education Lottery Scratch-Off Tickets

# Turkey Tripler



(Front)

(Back)

LAC/SCEL-05

Appendix A
S.C. Education Lottery Scratch-Off Tickets

LAC/SCEL-05

Appendix B

# Agency Comments

LAC/SCEL-05

Appendix B
Agency Comments

LAC/SCEL-05



December 6, 2005

Mr. George L. Schroeder, Director
South Carolina Legislative Audit Council
1331 Elmwood Avenue, Suite 315
Columbia, South Carolina 29201

Dear Mr. Schroeder:

We very much appreciate the opportunity to work with you for the benefit of the State and look forward to your continued assistance. We also appreciate the professional and courteous manner in which the auditors conducted themselves under the capable leadership of Priscilla Anderson.

Following are the South Carolina Education Lottery's (SCEL) written responses to LAC findings and recommendations.

*Lottery Salaries:* The General Assembly provided in Section 59-150-60(A) that the commission has all the powers "... exercised by commissions engaged in entrepreneurial pursuits on behalf of the State..." and to "appoint, select, or hire officers, agents, and employees ... to fix their compensation and pay their expenses." SCEL's business or quasi-governmental model is consistent with the trend of lotteries established in the last ten to twenty years. This model allows a lottery to react quickly to market conditions coupled with certain safeguards that apply to all state agencies to ensure openness, integrity and accountability.

Recently, a legislative task force completed a comprehensive and well-documented study regarding the future organization and profitability of the Minnesota Lottery. The study concluded that a board should be created to govern the lottery and it should operate on the same flexible business model with the accountability, oversight, operational budget approval and fiscal responsibility measures that are already in place for SCEL.[1] Comparing Minnesota to South Carolina using the same fiscal year, it is easy to understand the task force's recommendations. Operational expenses, including all payments to contractors, for SCEL in FY05 are 4.4% of gross revenue. Including retailer commissions, fixed by statute at 7%, overall administrative expenses are 11.4%, lower than the 15% allowed by law. Net income (transfer of proceeds) divided by population is the key benchmark for gauging a lottery's profitability and is the equivalent to earnings per share in the corporate arena. SCEL's per capita transfer of proceeds is $70, while the US median is $36. By this measurement, SCEL ranked 8th among the forty United States lotteries.[2] Expenses expressed as a percentage of total revenue were 4.6% making SCEL 8th among the forty lotteries in FY04.[3] Minnesota's per capita proceeds transfer was $20 versus SCEL's $70. Minnesota's expense ratio was more than double SCEL's.

Under the statute, the Commission is given broad latitude to determine and establish the compensation level of the Executive Director. In hiring the Executive Director, the Commission considered the salaries of other lottery directors; of SCEL's sister entrepreneurial agencies (the SC Public Service Authority and the SC Ports Authority); of private companies; and, of state agencies. The Commission elected to pay the Executive Director much less than salaries of SCEL's sister entrepreneurial agencies and other private companies and to pay a salary consistent with the salaries of directors in newer, entrepreneurial-based lotteries. The Commission did not provide the sales incentive and/or bonuses many other lottery directors receive, which are prohibited by SC law.

---

[1] Minnesota Lottery Organizational Task Force Report issued January 10, 2005.
[2] Calculations derived from FY04-Comparative Data LaFleurs 2005 World Almanac.
[3] Calculations derived from FY04-Comparative Data LaFleurs 2005 World Almanac.

When benchmarked against US enterprise-based lotteries, the SCEL Executive Director's compensation package compares very favorably. As lotteries become more entrepreneurial in nature, they are paying significantly higher salaries to their top executives:

- Effective 7/1/05 New Mexico increased their Executive Director's salary to $207,000. The Executive Director in place at the time has since taken the Executive Director position for the North Carolina Lottery.
- Tennessee pays a base salary of $350,000, with bonuses making the net closer to $750,000.
- Georgia's director earns $225,000 with bonuses of $100,000 for a total of $325,000.
- The Kentucky Lottery's Executive Director's total compensation is now $203,000.
- The North Carolina Lottery will pay its first executive director an annual salary of $235,000 with a $50,000 incentive if the lottery is started within five months, for a total of $285,000.
- The Oklahoma Lottery started this year and is paying a base salary of $175,000 plus a $30,000 signing bonus and two $25,000 bonuses for meeting instant and on-line start-up goals, for a compensation package of $255,000. In addition, an undetermined bonus will be paid two years after online lottery tickets go on sale.
- The CEO of the Iowa Lottery recently received a pay increase to $215,040.
- The Texas Lottery Commission is currently recruiting an Executive Director. The Board has discussed increasing the salary to the maximum amount allowed ($139,000) since current recruitment efforts have yielded no qualified respondents to their vacancy announcement. Texas is unique in that it out-sources significant elements of its operations (auditing, accounting, public relations, advertising, online gaming, and instant ticket printing). In FY 1994, the Texas lottery shifted from the State Comptroller's Office to the Texas Lottery Commission. According to an Associated Press Article printed in the Star Telegram, Texas Lottery Commission Chairman C. Thomas Clowe said the current salary of $115,000 is:

> ... just not enough to attract top candidates to become the next executive director of the nation's third-largest lottery... he's asking ... to increase the salary to $139,140, the state maximum for that type of position...

> Across the country, average salaries for top lottery officials range from between $105,000 to more than $220,000, said David Gale, executive director of the North American Association of State and Provincial Lotteries.

> Some small states pay less, but others pay much more, especially with performance bonuses. New lotteries offer increasingly higher salaries to lure proven performers.

> "There are an array of superb lottery directors out there, but the fact of the matter is that just like anybody else, they tend to go after those jobs that offer reasonable pay," Gale said.

> Tennessee Lottery President Rebecca Paul, the highest-paid lottery director, increased her base salary of $364,000 to roughly $600,000 last year by meeting performance goals, agency spokeswoman Kym Gerlock said.

> Tennessee lured Paul from Georgia in 2003 to help launch its new lottery. She had started Georgia's lottery and been its CEO for 10 years, making $500,000 her final year in base salary and incentives.

2

> *When Paul left Georgia, the Peach State recruited New York lottery director Margaret DeFrancisco, who increased her salary from $139,000 to $225,000. She also received a $100,000 bonus after her first six months.*
>
> *The executive director of Oklahoma's new lottery also received a hefty raise when he left Missouri's lottery after leading it for 13 years. He's set to make $175,000 a year, along with a $30,000 signing bonus and two $25,000 bonuses for meeting startup goals at a lottery about a tenth the size of Texas'.*
>
> *None of the more than 130 people who applied for the Texas job had experience leading a state lottery....*
>
> *While the executive director's salary is about the same as the governor's - and even more than the state comptroller's, whose office oversees billions in tax collections - Clowe said it pales in comparison to what top executives can make in the private sector.*

All lotteries are not necessarily comparable; therefore, consideration must be given to each lottery's structure and method of operation. Organizational structures range from being private corporations, to being independent or autonomous with appointed commissions, to being part of a cabinet, to being a division of a state agency. In addition, some lotteries outsource significant elements of its operations (online gaming, instant ticket printing, auditing, accounting, public relations, and advertising), while others use outside contractual services for only a few components, such as advertising and online games. The compensation of lottery directors varies accordingly with the mix of structures and operations.  Comparing the lotteries cited by the Council, the newer lotteries based on a flexible business model similar to SCEL's, pay salaries similar to, and in some cases significantly higher than, the salaries SCEL executives receive.

Before passage of the Lottery Act, the Budget and Control Board retained a consulting firm to provide a business plan for lottery start-up and beyond.  Certain aspects of this plan were used to establish SCEL's organizational structure and basic compensation plan.  SCEL went from 3 employees in the first week of August 2001 to over 100 when the first ticket was sold January 7, 2002.  Such rapid development was essential to successfully meeting the launch date and avoiding a substantial loss of both revenue and transfers to fund education.  Statements made by lottery officials of states currently in start-up mode bear this out.  During the start-up phase of the Lottery, the compensation for each employee was negotiated based on the "market rate" to employ an individual with the appropriate skill sets.  The majority of employees were hired from the private sector or other lotteries.

SCEL completed a compensation study in late 2003 which validated both its pay ranges and methodology employed in establishing them.  SCEL hired Mr. Trey Boone, a certified compensation professional and CEO of eSources, and used the Point Factor Job Evaluation method widely recognized as valid.  It is the most commonly used job evaluation approach in the United States and Europe.  eSources used data from other lotteries and the public and private sectors in the analysis.

The compensation philosophy adopted by SCEL is to be externally competitive and internally equitable. We recruit, hire, and attempt to retain the best employees. From a business perspective, this explains our success. The majority of staff is multi-functional, motivated, hard-working, and committed to our mission. New forms of pay, like the compensation package used by SCEL, are less entitlement oriented and more linked to individual, group, and corporate performance.[4]   As supported by compensation and human resources experts[5], we feel confident that we have a valid method of compensating SCEL employees and determining appropriate salary ranges. As a best practice, we review and conduct independent compensation studies every two to three years to maintain our competitive edge. At the December 8

---

[4] J. R. Schuster and P.K. Zingheim, *The New Pay: Linking Employee and Organizational Performance* (New York: Lexington Board, 1992)

[5] Memorandum to Hopkins from Trey Boone, President, eSources, Certified Compensation Professional

· Commission meeting, the SCEL Board will review a proposal to hire an independent consultant to update the 2003 salary study.

The report states that SCEL "salaried employees have seen increases since date of hire averaging 25%." A SCEL analysis reveals the Council's observation includes part-time interns hired at hourly rates and subsequently offered full-time, salaried employment which significantly impacts the average. SCEL's starting hourly wage rate for part-time interns is $8, whereas full-time positions for which these specific employees were hired paid, on average, a little less than $30,000 a year, or $14.42 per hour. In one case, a part-time, hourly paid receptionist accepted a full-time position constituting an 83% pay increase using the Council's methodology. Unusual transactions of this nature should not be considered in the analytical review because they significantly affect the overall average and paint a distorted picture of actual SCEL practice. All other personnel pay adjustments are significantly lower than 25% and relate directly to changes in business circumstances which warranted the compensation increase based upon prevailing SCEL guidelines. In fact, between FY 04 and FY 05, overall salaries decreased by approximately $122,000.

As cited, SC Code Section 59-150-100(A) authorizes SCEL to create its job classification and compensation system to carry out its mission. SCEL management utilized process improvement methods and increased the duties and responsibilities of existing employees, rather than adding new positions, thereby maximizing resources and minimizing costs. Pay adjustments were primarily due to business decisions involving restructuring departments, merging job functions, adding duties to positions, deleting positions, bringing outsourced functions in-house, and other activities allowing SCEL to operate *more efficiently with fewer personnel.* Further, SCEL has actually reduced individual employee compensation up to fifteen percent in some cases. In most instances, SCEL could have hired additional personnel and incurred higher overall administrative costs and headcount. To emphasize this point, Kentucky's lottery employs 201 staff members to South Carolina's 138 full-time employees. Kentucky also out-sources the majority of its advertising to a private vendor, whereas SCEL now handles the majority of its advertising in-house. This is further evidence that staffing and compensation are fair and reasonable when SCEL is benchmarked with other comparable lotteries.

The report also states that, if SCEL paid its employees less, there would be more money for education programs. Although there are exceptions, a well-developed plan linking pay to employee productivity and efficiency generally results in better individual and organizational performances. Studies have shown a high correlation between pay and performance.[6] SCEL's outstanding record supports the Commission's pay structure. SCEL's results are directly related to the General Assembly's wise choice in the oversight and governance structure for SCEL, allowing our employees to succeed.

In closing, the following important points should be taken into consideration:

- The General Assembly crafted the Lottery Act in 2001 to permit SCEL to be a unique state agency "engaged in entrepreneurial pursuits on behalf of the State", thereby recognizing the need to function as an entrepreneurial entity.
- The salaries of lottery executives in new lotteries based on a business model similar to South Carolina's are generally higher than SCEL's. In addition, certain lottery salary comparisons are misleading because of organizational structure and method of operation.
- SCEL's methodology for establishing its compensation system is widely recognized as valid and is the most commonly used job evaluation approach in the US and Europe.
- SCEL's management philosophy is to increase duties and responsibilities of existing personnel where possible, utilizing process improvement methods instead of adding positions to maximize resources and minimize costs. Such philosophy sometimes dictates salary increases as well as salary decreases. In fact, between FY 04 and FY 05, overall salaries decreased by approximately $122,000.

---

[6] R. Heneman, *Merit Pay: Linking Pay Increases to Performance Ratings* (Reading, MA: Addison-Wesley, 1992)

4

We respectfully submit that SCEL does have a methodology for determining employee salaries, as authorized by the Lottery Act and proven herein, which considers actual salaries in other state lotteries. As indicated above, the SCEL Board will review a proposal to hire an independent consultant to update the 2003 salary study at its December 8 meeting. SCEL will ensure entrepreneurial-based lotteries similar to South Carolina's are included in the study.

*In-House Purchasing of Promotional and POS Items:* We agree with the Council's recommendation regarding purchasing promotional and point-of-sale items in-house. SCEL officials recognize we are already heavily involved in controlling such purchases by the advertising contractor. We believe such involvement to be evidence of sound business practice and commitment to adherence to the State Procurement Code as well as Small and Minority Business (SMB) goals. In addition, ad agency staff critiques and provides suggestions regarding these procurements based on their knowledge and understanding of the advertising industry.

In FY 05, only 13 of the 309 (.03%) CN invoices were for promotional items. As the LAC reported, all purchases were in accordance with the contract. We have never needed to document that it is more cost-effective for SCEL to perform the duties since they are currently covered by the retainer fee.

On November 7, 2001, SCEL entered into an advertising and media contract with CNS&G (now known as CN) with a monthly retainer of $82,500. As SCEL matured, we brought many marketing duties in-house. In November 2003, we renegotiated the pre-existing contract to reduce the monthly retainer to $15,000. This has resulted in a total cost savings in excess of $900,000 since October 2003.

SCEL continues to closely monitor this contract to ensure all efficiencies are being maximized and SCEL receives the benefit of all services afforded under the contract. Considering the required monthly retainer, we attempt to delegate as many tasks as allowed to maximize services from CN until such time as the contract is re-bid or renegotiated. The contract ends in November 2006, and SCEL is committed to effectuating additional cost savings on any new advertising procurement as may be appropriate. As indicated in the 2006 Sales and Marketing Strategic Plan, SCEL plans to bring additional functions in-house including purchase of promotional and point-of-sale items, if considered advantageous, as recommended.

*Internal Audit Noted Improprieties in Credit Card Purchasing:* We agree with these recommendations. We strive to have policies and procedures in place to ensure prevention and detection of errors and irregularities, including those discussed in the report. Formal policies along with procedural requirements such as training and cardholder signatures are part of preventative measures in that they serve to potentially deter individuals from knowingly or unknowingly circumventing policy. After that, detective measures such as internal audits are necessary. In our internal audit of 100% of procurement card purchases, all other departments and card users were found to have used the card appropriately and all other equipment was accounted for. In addition, Budget and Control Board policies on procurement card purchases were in place and were followed.

Although no amount of training will ever prevent circumvention of policy by an individual intent on doing so, we agree training and proper paperwork is essential.

We agree with the recommendations, and will incorporate the State Procurement Code and Purchasing Card Program Procedures issued by the Budget and Control Board, as well as other related SCEL directives, into one purchasing manual. We will continue to provide and document training of purchasing card holders and will ensure employees sign cardholder agreements.

*Communication of the Odds of Winning:* Communication of top prizes available is an industry-wide issue. SCEL strives to advertise games in a manner which is fair, accurate and will not mislead our players. SCEL also strives to advertise in a manner consistent with good advertising standards. Online games have been the subject of more television advertising than have instant ticket games. Instant games typically receive limited support on television and are more often advertised on radio.

5

For example, regarding television advertising, the Council cited Palmetto Cash 5 commercials for the month of April 2005. We would like to point out that verbiage in the ads also contained terms such as "up to" and "potential". The signage referenced in one ad cited in the report was a truck passing by a window with the Palmetto Cash 5 logo displayed on its side. The visual appeared for less than two seconds and actually read "*power-up to $500,000*" and the broadcaster expressly stated "power *up to* $500,000". The ad was designed to showcase our winners.

Regarding radio advertising, we advertise one or two instant games per month via ten-second traffic reads. Since additional time results in additional costs, SCEL places emphasis on instant games at the retailer level including an odds of winning and losing piece (as required by statute) and play slips with online game prize odds by prize. In addition, SCEL places laminated oversized instant ticket samples for all games detailing instant prizes available and odds by game at the play stations.

SCEL understands the importance of effectively communicating game odds and appreciates the Council's concerns. We will continue to review all methods of communicating top prize odds to players, including all print media and billboards. SCEL will increase the size of its font when advertising the odds of winning a game and any additional information of this type. SCEL will also include top game odds on all television and radio advertising where cost issues do not inhibit its ability to accurately provide this information.

SCEL agrees with the spirit of the recommendation regarding printing top prizes available on tickets and will continue to research ways to effectively resolve this industry-wide issue. We are concerned this suggestion may become confusing to our players. Each time a ticket is purchased by a player, a top prize may be reduced from the prize pool. If a top prize is won, the odds of winning a top prize printed on a ticket would become misleading. In addition, many games are designed to provide significant winning opportunities in the mid- and lower range prize points. Printing only the top prize odds may, in many instances, fail to convey adequate information, and there is not enough room on most tickets to provide information regarding all other prize levels. Therefore, we believe the point-of-sale information required by statute at the retailer location is the most effective means of communicating odds and appropriate disclaimer information regarding sales. Taking all of the foregoing into account, SCEL will continue to research ways to meet the spirit of the recommendation. We will ensure all point-of-sale information at the retailer location is timely.

Regarding readability, SCEL always endeavors to provide a product that is easily interpreted by a broad range of the SC population. Compliance with legal requirements, particularly in game rules, can affect readability. SCEL attempts to address readability issues through focus groups and retailer feedback. Staff will seek advice and counsel from reading and literacy experts to determine the manner in which modifications may be implemented.

Regarding posting of odds and risks of gambling, SCEL provides templates to marketing and sales representatives to ensure accuracy and consistency. The template ensures that all play stations have current information and a uniform look throughout our state for players to easily find game information. Staff continually monitors information to keep players informed of all product information.

SCEL uses retailer space as judiciously as possible when providing game information. The lottery's presence in the retailer location competes with other product-oriented businesses such as snack, beverage and cigarette companies. Space and placement in the store is important to companies selling competing products. It is not an uncommon practice for vendors to offer specials, discounts, and other promotional incentives to their retailers to guarantee placement of advertising materials within or outside of a store. Many companies also pay a retailer for the space their product occupies to maximize product placement. For this reason, SCEL has a limited amount of space provided by retailers for the posting of lottery-related information. In addition, every store is set up differently and requires a slightly different strategy. Therefore, adopting a policy which requires or mandates retailers to provide SCEL with more space or space in a certain specified location would be burdensome on the retailer, who is our customer.

SCEL will attempt to define in writing what constitutes the posting of a conspicuous sign, considering the issues cited above. SCEL will continue to place signage in the most conspicuous areas available at the retailer location and in compliance with Section 59-150-60(A)(18). To achieve this objective, SCEL will continue to use "play stations" for the posting of most game information, the only area within a store the lottery controls for the posting of game information.

*Lottery Tickets Sold After All Top Prizes Have Been Claimed:* End of game procedures once top prizes have been claimed is an industry-wide issue. Although SCEL follows other jurisdictions closely in handling game closing and does not have an end-of-game procedure different from some other lotteries, we strive to provide the maximum benefit to our players. Missing from the report is any discussion of the numerous times instant ticket games were ended when one or more top prizes remained in the game.

SCEL requires instant ticket games be created with unique prize pools based on algorithmic formulas designed to ensure that top prizes, as well as all other prizes, are distributed throughout the print run.

SCEL also holds weekly staff meetings to discuss game strategies and monitor existing prizes remaining in games. Decisions to end a game are based on best industry practices including top prizes remaining. This analysis includes a review of all product information including, but not limited to, game sales, prizes claimed, and critical dates in the planning process. SCEL continuously evaluates the process of managing games.

SCEL follows a two-tier process for ending games. First, it is custom and practice to end games with top prizes over $50,000 when the last top prize is claimed and no bonus second-chance prize is available to players. SCEL uses second-chance draws on a majority of the higher-tier games to ensure players have a remaining top prize to play for after a game has officially ended.

Instant games with top prizes below $50,000 are not generally discontinued due to the large amount of lower and mid-tier prizes distributed throughout the game. Research indicates that many lottery players do not play for the top prize. Staff has researched and will continue to research various second-chance options on this type of game to ensure players have an opportunity for extended play.

S.C. Regulations originally written by SCEL provide that retailers may continue to sell each instant game for up to 90 days after the official end of that game. Scientific Games International (SGI) programmed SCEL's Game Management System for this requirement. In addition, SCEL's instant ticket contract with SGI is not a cooperative services contract based on a percentage of sales, as is industry custom. In most other states the vendor, not the lottery, absorbs the cost of unsold ticket stock. SCEL pays a set price per ticket. Therefore, we make every effort to monitor all games and provide the best information available as to prizes remaining in order to satisfy player's expectations, and offer desirable prizes to players throughout the games, while at the same time controlling costs and maximizing revenue for education.

SCEL will continue to monitor top prizes and provide playing options that provide players with an opportunity for bonus drawings for top prizes. SCEL will also consider submitting a request to the General Assembly to amend Regulation 44-40.10 to require retailers to discontinue the sale of scratch-off lottery tickets immediately after being notified a game has been officially ended should we conclude it will be beneficial to our stakeholders.

*Prohibition Against Election Day Lottery Ticket Sales:* SCEL agrees with the Council's recommendation to allow lottery sales on election days and will gladly offer any research, data and/or other assistance requested at such time as the General Assembly wishes to consider this issue.

*Data Collected On The Sale Of Lottery Tickets To Minors:* We are aware of the studies cited in your report and agree it would be a good idea to determine if minors are able to buy lottery tickets in South Carolina. As cited, Section 59-150-210 (D) prohibits the sale of lottery products to persons under the age of 18. We have therefore refrained from contacting minors for demographic studies as a policy issue. In making this decision, we considered the ramifications of having an independent firm contact a household and ask to survey their minor child on behalf of the lottery. We do not believe such an action reflects the good taste and integrity we have exercised in our day-to-day business.

In addition to Section 59-150-325 regarding the demographic study, Section 59-150-60(A) states the Commission has "...the powers to...conduct necessary or appropriate market research, which may include an analysis of the demographic characteristics of the players of the lottery game and an analysis of advertising, promotion, public relations, incentives, and other aspects of communication...." In the past, we have considered performing such "market research" through surveys outside of retail locations. However, Section 59-150-325 regarding the demographic study of lottery players requires data "must not be collected from players at the time of purchase or point of sale." Therefore, SCEL made a policy decision not to perform surveys of any nature with lottery players in or around retail locations to ensure strict adherence to the intent of this requirement.

We agree it would be helpful to determine whether persons under 18 are purchasing lottery products. To ensure SCEL continues to operate with the good taste and integrity we strive to achieve on behalf of the citizens of this State, we believe it would be best for an entity with law enforcement powers to conduct an undercover operation, which would be consistent with their powers and duties.

SCEL Security staff currently forwards allegations of a criminal nature to SLED upon receipt. To satisfy the spirit of the recommendation, we will consider performing such research as recommended and/or will request an investigation by an appropriate law enforcement entity into whether persons under 18 are purchasing lottery products.

_**Illegal Gambling At Lottery Retail Outlets:**_  We agree with these recommendations and will continue to observe retail outlets and notify law enforcement officials of suspected illegal gambling machines. We will create a policy regarding written notification to SLED when there is evidence of illegal gambling activities. Currently, information received by the SCEL Security Department from various sources, including SCEL Marketing Sales Representatives, concerning the possibility of illegal gambling activity at lottery retail outlets is routinely passed to SLED through personal contact, telephone and facsimile transmission. SLED, which also gets such information from numerous other sources, accumulates and analyzes data to prioritize the use of resources. Further investigation is almost always required to ascertain if reported machines are illegal per se and/or a retailer is making payoffs to players. SCEL is currently cooperating with SLED to educate retailers regarding those machines law enforcement believes violate Section 12-21-2710. SLED is developing a message, which SCEL will send through its sales terminals, informing retailers which types of machines and games should be discontinued. SCEL will continue to be diligent in this area.

## FOLLOW UP ON PREVIOUS REPORT:

_**Cell Phones:**_  SCEL continuously monitors cell phone cost and assignment. In the fall of 2004, we reduced the number of phones by 6 percent. In June of 2005, several more lines were dropped bringing the total FY05 reduction to 10 percent. SCEL recently changed providers again, resulting in additional savings of 27% or $16,927 per year from the beginning of FY05. Through effective management review of usage and negotiations with the new provider, SCEL was able to reduce the costs by an amount greater than the corresponding reduction in the number of peak minutes. In addition, the new provider agreed to provide SCEL software to analyze usage, further define our true business needs, and thus further reduce costs. As we further define the total minutes needed to conduct SCEL business, it is likely that carriers will reduce the number of phones they are willing to provide for that pool of minutes. SCEL officials have identified which employees may not need a cell phone and will eliminate their phones at such time as fewer phones are provided by the carrier.

_**Leased Cars:**_  The Commission continues to monitor and study this issue and will consider providing state-owned leased cars to employees when it would be more cost effective. The Commission agrees it should assign leased vehicles when a continuing cost savings appears probable and will continue to do so. SCEL Internal Audit recently began an analysis of currently leased vehicles. The SCEL Executive Director may consider eliminating additional vehicles depending on the final results.

*Performance Measures:*  As with most activities, SCEL judiciously seeks to implement the best practice for measuring the multiple activities required to achieve our sales goals and mission. We have solicited the assistance of the Office of Human Resources, Budget and Control Board, to train staff on the methodology for developing performance measures and a standard methodology for maintaining the data so that we can objectively determine if goals have been met.

As we gain experience in measuring performance, we continue to improve the process. In addition to continuing to improve procedures for developing, analyzing, compiling and reporting our current performance measures, we are also exploring other measurement methods and techniques, such as the Balanced ScoreCard, and will determine if they are suitable for SCEL. We have also planned additional training with the State Office of Human Resources.

*Statutory Changes:*    The Commission continues to gladly offer any research, data and/or other assistance requested at such time as the General Assembly wishes to consider these issues.

*Claims Audit:*    The Commission agrees the Claims area is an important area for audit. As pointed out in the report, audit of the area was on the FY 04-05 Audit Plan. The planning phase of the audit was interrupted by an audit and subsequent investigation of State Procurement Card transactions discussed by the LAC herein. The Claims audit is scheduled to begin within the next few weeks. The SCEL internal auditor will ensure the Claims Office is audited on a systematic basis.

Thank you for the opportunity to comment. Again, we appreciate the opportunity to work with you for the benefit of the State. We look forward to your continued assistance.

Respectfully,

John C.B. Smith
Chairman